FILER FIBRE CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 24877. Promulgated December 17, 1928.

*Oscar E. Waer, Esq.*, for the petitioner.
*J. L. Backstrom, Esq.*, for the respondent.

OPINION.

SIEFKIN: This is a proceeding for the redetermination of a deficiency in income and profits taxes for 1920 in the amount of $2,276.97. Error is alleged as to the disallowance of certain depreciation claimed on buildings, machinery and equipment.

The petitioner is a corporation with its office and principal place of business at Filer City, Mich. On its income and profits-tax return for 1920 it deducted $4,539.52 and $18,286.89 as depreciation on concrete buildings and machinery and equipment, respectively. In determining the deficiency involved in this proceeding the respondent disallowed $1,597.63 and $3,352.31 of the deductions for depreciation of buildings and machinery and equipment respectively.

The petitioner built its plant, which was a pulp mill and not a paper mill, and which was designed and used for the manufacture of unbleached sulphate pulp, commonly known as Kraft pulp, in 1916 and 1917, and started operations shortly after January 1, 1918. It took depreciation in 1918 and 1919 at the rate of 5 per cent on buildings and at the rate of 10 per cent on machinery and equipment. It intended to take the same rates in 1920, but instead of those rates being applied to the building and to the machinery and equipment accounts as of January 1, 1918, they were applied to the accounts as reduced by the depreciation taken in 1918 and 1919. The result was that rates of only 4.6 per cent and of only 8.6 per cent were taken respectively on buildings and on machinery and equipment—straight line depreciation. The following table shows the original cost of, and depreciation taken on, buildings and machinery in 1918, 1919, and 1920:

Buildings constructed in 1916 and 1917:

| | |
|---|---:|
| Cost (1918) | $50,404.73 |
| 5% depreciation 1918 | 2,520.23 |
| No depreciation for 1916 and 1917 | |
| Cost (1919) | 97,567.89 |
| 5% depreciation 1919 on $95,047.66 | 4,752.38 |
| Cost (1920) | 98,063.04 |
| 5% depreciation 1920 on $90,790.43 | 4,539.52 |
| Amount carried on books Jan. 1, 1921 | 97,567.89 |

Machinery and equipment installed, 1917:

| | |
|---|---:|
| Cost (1918) | 120,023.82 |
| 10% depreciation 1918 | 12,002.38 |
| No depreciation for 1917. | |
| Cost (1919) | 196,800.12 |
| 10% depreciation 1919 on $184,797.74 | 18,479.77 |
| Cost (1920) | 213,351.13 |
| 10% depreciation 1920 on $182,868.98 | 18,286.89 |
| Amount carried on books Jan. 1, 1921 | 196,800.12 |

The respondent allowed a rate of 4 per cent on buildings and 7 per cent on machinery and equipment, or a total of $2,941.89 on buildings and a total of $14,934.58 on machinery and equipment.

The petitioner built its plant in 1917 and 1918 after the United States had entered the World War. Because of the control by various governmental war agencies of raw materials, and because of the difficulty in obtaining good machinery, the petitioner, in the construction of its plant, was compelled to use inferior grades of

materials and inferior machinery and other equipment. As illustrative of what took place in this respect, the company was required to replace within a very short time three evaporators, six liquor tanks, and two digesters.

Because of the extraordinary demand for pulp in 1920 the company operated its plant far beyond normal capacity. Its normal capacity, as demonstrated by its operations both prior and subsequent to 1920, was about 20 tons per day. During 1920 the plant produced approximately 30 tons of pulp per day. The total production of pulp in 1918 was 6,284 tons; in 1919, 7,551 tons; and in 1920, 9,151 tons. During all of these years the mill was operated 24 hours a day, but during the year 1920 the plant was not shut down over Sundays for repairs, it having been run continuously and repairs having been made while the plant was in operation. These repairs were not such as should have been and as are made in normal times, so that the result was much more wear and tear on the machinery and equipment in 1920 than in previous and subsequent years.

The digesters, evaporators, rotary furnaces and other machinery were constantly in operation during the year 1920, and because of such constant operation without necessary repairs being made from time to time, and because of the inferior quality of the materials entering into various parts of the machinery, a very rapid deterioration took place. The machinery was largely of special design and very expensive. The digesters, installed originally at a cost of from $8,000 to $12,000, each, did not stand up under the forced operations and developed cracks and seams. Two of the digesters finally had to be taken out entirely. The evaporators and rotary furnaces had to be rebuilt and later taken out entirely and replaced. No replacements were charged to operation or maintenance. All replacements and new construction at all times were charged to the capital account.

The plant of the company in 1920 consisted of a wood room, a digester house, a diffuser room, a boiler house, a wet machine room, and a recovery building. These buildings were all of the same general construction, consisting of steel columns and trusses, with steel reinforced floors, straight concrete foundations and straight concrete walls up to a height of about 6 feet, with brick walls above that point. The roofs over the buildings were wooden roofs over the digester house and diffuser and wet machine rooms, and asphalt and steel on the recovery building and boiler house. The roofs over the recovery building and boiler house were replaced after four years of operation on account of destruction by chemicals and moisture incident to the pulp mill operations. All of the wooden roofs had to be extensively repaired and replaced in 1928. The brick walls in the recovery building, particularly in the upper parts thereof, had to

be partly replaced in 1928. These walls were reached by fumes from chemicals used in the pulp-mill operations and deteriorate very rapidly, having a life of not to exceed 10 or 12 years. The wooden roofs were constantly subjected to heavy condensation, rapid changes from wet to dry and from heat to moisture and vice versa, resulting in rapid deterioration of materials and requiring replacement in from seven to eight years. At the time of the construction of the company's pulp mill it was estimated that the life of the company's operations would not exceed 20 years, based on the available supply of pulp wood. After the war and because of foreign competition in pulp, the company found that to continue in business it had to build a paper mill, which it did in 1922.

The machinery in the wood room consisted in a general way of a large barking drum, a chipper, wire screens, conveying machinery, motors, etc. In the preparation of pulp wood it is barked in the barking drum, which creates a great strain upon the drum and repairs and replacements are necessary in the barking room almost constantly by replacing angle irons, bolts, etc. The life of a chipper, which cuts the wood into chips, is about two years. The knives in the chipper are replaced every six hours for regrinding, and a set of knives lasts about three months. The chipper screens by continuous operation are not replaced in their entirety, but the wire screens therein contained are replaced within four years, and this replacing necessitates the rebuilding of the screens on account of the constant wear and tear. The conveying machinery has a life of about 10 years, but is subject to constant repairs and maintenance. The motors in the wood room are subjected to unusual wear and tear and call for constant care on account of the dust created on account of the barking, chipping, and screening of wood.

The machinery in the digester house, so-called, consists of three large valves or digesters. These digesters are made from the highest grade of steel obtainable and are of one piece and hammer-welded. They are of a cone shape and approximately 9 feet in diameter and 20 feet long. A steam pressure is necessary for the cutting of the wood from 150 to 180 pounds and the digesters are tested for 200 pounds, cold water pressure. The alkali liquor, which eats the steel, and the contraction and expansion on account of the steam pressure make a great strain upon these units. The petitioner had to replace in 1926 the first digester installed in the fall of 1917 and first used in January of 1918. These digesters ranged from $8,000 to $12,000, each, in price. In the digester room and other portions of the plant the machinery required extremely heavy gears and steel structure on heavy foundations, all subjected to tremendous strain and stress and all resulting in high charges to maintenance and upkeep and rapid depreciation.

In the diffuser room one new diffuser had to be installed in August of 1926. A great amount of piping was necessary in this room to carry the liquor and stock to the diffusers and the replacement cost upon the valves in conjunction with this piping was extremely heavy, particularly the valves and connections to and from the rotary digesters and recovery buildings. On account of moisture the replacement of the flat screens and Shaker screens for the screening of pulp is necessary to the extent that the wooden portions of the screens must be replaced every 5 or 6 years. The Cooper screening and the screens must be replaced every 3 or 4 years.

In the operation of the recovery building 8 to 12 storage tanks, together with rotary furnaces, were used. On account of the alkali liquor which is being recovered and the water evaporated therefrom in order to save the chemicals which eat the iron and steel, the evaporation tubes in the recovery building have to be replaced every 9 to 13 months and the causticizing tanks have to be replaced about every 7 years. There were 7 of these tanks in the recovery building in 1920, costing approximately $6,300. In the operation of the recovery building there were 8 to 12 storage tanks of large size which are subjected to the alkali, which eats into the iron and results in a life of from 7 to 8 years. There were thousands of feet of piping of various sizes up to as large as 10 inches in diameter, used to carry the liquor to and from its sources of supply, and these pipes have to be replaced about every 8 years. In the recovery process a black ash is obtained through rotary furnaces. A terrific heat is necessary in this operation and also in the making of " white liquor " from the black ash, which goes into furnaces constructed of soapstone and extraordinary quality of fire brick, carrying a cost greater than fire brick ordinarily used for boilers. The terrific heat makes it necessary to replace these furnaces in anywhere from 4 to 8 months.

There are some items of machinery which were installed in the pulp mill plant in 1918 which are still in use, but their condition is very different from the condition when they were installed. Certain portions of many machines are still in use, whereas other portions have had to be entirely replaced. All replacements, as already stated, comprising the purchase of new machinery and equipment and of new installation, have at all times been capitalized and not charged to expense. Among numerous items which have had to be entirely replaced during 10 years operation are three Swenson triple-effect evaporators costing $3,600, three steel-plate three-compartment tanks costing over $4,600, one steel-plate white-liquor tank costing $780, one Kellogg steel welded digester costing $13,065, one Manitowoc steel riveted digester costing $7,914, and two open liquor tanks costing $1,207. In addition to these items, all of the motors in the

plant have been taken out and 60-cycle motors purchased. All of these motors and all of the machinery which has had to be replaced have been capitalized. No amortization charges were made against the 30-cycle motors which were taken out. They are still on hand, as the company has been unable to dispose of them. The items of machinery enumerated which have had to be entirely replaced covered only the major replacements. In addition to this many other items have had to be replaced. All items of replacement constituting new machinery, new purchases, or new construction were capitalized and appeared on the books of the company.

From the above facts, which are uncontradicted, we conclude that the amounts taken as depreciation by the petitioner were reasonable and that the disallowance of a portion by the respondent was erroneous.

*Judgment will be entered under Rule 50.*